Good morning, your honors. My name is Michelle Betancourt, and I represent Jose A., the juvenile, in this matter. I'd like to reserve two minutes for rebuttal. Are you with the Federal Defenders? I am, your honor. Don't put their names down anymore. They don't put their name in. They just put the name. They don't put Federal Defenders of San Diego. It's like you put a firm name on it. I am with the office in San Diego, your honor. Okay. I just want to give you the proper billing, and go ahead. Thank you. Your honor, we're requesting reversal of this case for two reasons. First, the Juvenile Delinquency Act was violated. There was numerous violations committed by the agents that were so egregious that resulted in due process violation of Jose A. and requires mandatory reversal. You're also requesting dismissal of this case. Yes, I am requesting dismissal of the information in this case. If the court finds that there was the – if the court does not find a due process violation, we do believe that there was prejudice in this case that would still require reversal of the information in order to protect the juvenile in this matter. Well, he's incarcerated now, isn't he? He is, your honor. And he's had a ten-month sentence. He did, on top of the two months that he had already been in custody during the pendency of the case. Is he back in Mexico now or will be shortly? In approximately a month, your honor. Well, if we don't get this out in a month, then what are we going to do about remand if you want one? He won't be available. We have contact with his family. I think for him it's an important reversal because he lost his ability to enter the United States, and he lost his visa and border crossing card as a result of this adjudication. Yeah, but then if we remanded, he'd have to have a new hearing. He would, and I think that we could still conduct that. I can represent him there and conduct that in his absentia. So you're saying it doesn't make any difference. It's not mooted by his – if we come out and he's served his full sentence. I don't believe so, your honor, no. All right. Your honor, in this case, I think the agents violated every requirement of the JDA Act. It's unambiguous, and it sets forth basically four requirements here. The agents violated every one of those requirements. They are supposed to immediately advise the juvenile of his rights. In this case, although it was only an hour that they waited, there was two contacts with two officers before he was advised of his Miranda rights. He was arrested at 415 in the afternoon, and he wasn't advised until 524. He had had contact with the arresting officer at the port of entry who handcuffed him and escorted him into the security office. And then he was contacted by Agent Cabrera, who was the one agent who made a three-minute phone call to his aunt. Second, they're to immediately notify his parents of his custody and of his rights. And the agents here did none of that. Well, tell me, where was his aunt? His aunt was in Mexico. And where were his folks? His folks were also in Mexico. So there's no problem in getting contact with him, you say? No. In fact, Jose gave the phone number to his aunt because his parents don't have a phone number, but his aunt lives next door. So he gave that phone number. The aunt informed the agents that they could be there in an hour and a half. But the agents in this case chose not to wait an hour and a half. They waited nine minutes following that phone call and interrogated the juvenile. Now, they didn't bother contacting the consular office. All they did was, after the interrogation, send a fax to the consulate advising them that a juvenile had been detained. They didn't indicate anything other than that. Now, wait a minute. They did contact the consul? They sent a fax, Your Honors, at 7 o'clock after the interrogation. Well, when are they required to notify the consul? Well, the case law indicates that if they are unable to locate a parent or guardian, the next step, especially with a non-citizen, is to make contact with the consulate of their country. And here, in this case, it would be the consul. Is that before or necessarily before the interrogation? It doesn't say anything about that, does it? It would be in place of the parent. It would be as a surrogate to the parent. Is there a case that says that? There is, Your Honor. And if you – it would be an RRA at 745, which says where parent notification is not feasible, then they are to contact either a surrogate. And in that case, it was the Mexican consulate. They could have notified the Mexican consulate. Well, isn't a surrogate the aunt, too? Could that be a surrogate? It could have, Your Honor. But even in that case, they chose not to do that with the aunt. All they told the aunt was, your nephew is in custody. Please advise his parents, and the phone call ended. They didn't bother advising her of the rights. They could have tried to comply with the requirements of the JDA by advising the aunt and maybe trying to use the aunt as a surrogate, but they didn't even do that in this case. They didn't even bother giving her a callback number or a way of contacting the case agent in this case so that when she did find the parents or when she herself had further questions, could call them back. You indicated that there was prejudice. Would you discuss that? I see your time is rapidly expiring. Yes, Your Honors. Your Honors, I think the prejudice here, one, is not – one, that the statements made by Jose led to his prosecution, I believe. Now, were his statements exculpatory? His statements were – there was statements taken that were exculpatory, and then in the end there was inculpatory statements. What were the inculpatory statements? That he believed there was something illegal in the car, and the agent testified that what he had said he thought was that it was marijuana in the car. Actually, it was not marijuana. It was not marijuana, Your Honor. So isn't that totally exculpatory? He didn't know what was there. Well, unfortunately, the fact that he doesn't know what controlled substance is in the car is not wholly exculpatory. So long as he knew that there was a controlled substance in the vehicle, in the car, that would be sufficient. Didn't he tell the officers that he was in the car to go to California to get some forged documents or visas? He did. That was his initial statement to him. He believed he was picking up forged documents. So he never confessed to being in possession of cocaine? No, he did not. Your Honor, I think... So I'm having trouble seeing then how his failure to confess and his indication he had no knowledge of what was there was inculpatory. Well, the fact that the agent thought it was sufficient that he knew that there was a drug in the car, and that was sufficient for him. I think, additionally, we are allowing officers here to nullify the acts of Congress. Just because the district court then finds that the statements were voluntary or that there was no prejudice doesn't – shouldn't allow all these officers in the Southern District of California to continuously violate the JDA. They get away with not advising the juveniles immediately, with not calling their parents and advising them what their rights are. And we have Agent Cabrera and Agent Zucchelli testifying that, for example, Agent Cabrera had 10 to 15 juvenile matters that she proceeded in the same exact manner, and that's at ER 72. Agent Zucchelli, the case agent in this case, specifically stated that he had handled at least four of these matters and had proceeded in the same manner, not contacting the parents, not waiting at least an hour and a half. And even the district court said they could have at least waited that hour and a half. And the juvenile's father did arrive at the port of entry at 7, which was an hour and a half from the time that they advised the juvenile on this matter. So the other thing I'd like to point out is that the U.S. attorney in this case, Mr. Jones, was contacted by Agent Zucchelli, and it was only at his insistence that the facts were sent to the consulate. I don't think that Agent Zucchelli would have even sent the facts if it wasn't because the U.S. attorney, Mr. Jones, had indicated to him to send the facts after the fact. And that's at ER 109-110. So I think in this case, Your Honors, there is a violation of due process. It violates the fundamental fairness of these proceedings, and the information should be dismissed. Thank you. Good morning, Your Honors. My name is Randy Jones. I'm an assistant U.S. attorney, and I'm speaking on behalf of the appellate of the United States of America. First of all, I want to point out a misquote or statement in our brief that is not absolutely accurate. It's contained on page 19 of our brief, footnote number 8, where it says that, and I'll just state the last sentence, however it is worth noting that this circuit has never interpreted Section 5033 to require parental notification of juvenile Miranda rights. That's not, as you know, absolutely correct. Basically what it is saying, and I think what we wanted to say, is that there's no per se rule that absence of notification of the parent, or failing to notify the parent, is a automatic, requires automatic reversal of the case. I think that that's a more accurate statement of the law. So we'd like to bring that to the Court's attention and say that that quote is wrong in the brief. With respect to this case, even though Judge Huff found technical violation of the JDA by the officers not contacting the parents in this case, the Court did, in fact, suppress the statement. And so we argued that there was no prejudice to the defendant, even if there was a technical violation of the JDA. Let me ask you a question. Why can't these officers follow the law? Well, I think the officers in this case attempted to follow the law. They took reasonable steps to contact the parents. They talked to the juvenile. The juvenile said that he didn't have a phone. He didn't have a way to get in touch with the parents. Why didn't they contact the consulate? Well, they contacted a person. He did give them the number of a person who he felt. They called the aunt, and the aunt said that the mother was at work, the father was at work, and that she could be up there, what, an hour and a half. She said it would take her about an hour and a half. She never said that she was going to actually come to the port of entry. She just said that she lived far away and that it would take her an hour and a half to get there. But the officers just told her to make sure to just try to get in touch with the parents. And then they asked her if she had any problems with them talking to her nephew, and she said that she didn't. So in that particular case, the officers felt. She's a surrogate. Were they required to tell her about the Miranda rights? The Miranda warnings? No question. Yes, they were. They don't have respect for Miranda. Is that it? I don't think that was it. I just think that because of the situation in this case, things were happening fairly rapidly. You had a situation where this juvenile had over 65 pounds of cocaine that he had smuggled into the United States, that they felt that they had done what they were supposed to do. The court found that they hadn't. Did they get training in this? I'm not sure, but I'm sure that they did. Well, how are they going to learn to do it right? Well, I think that one of the things that we've discussed is that perhaps there should be training from our office to make sure. It's been going on for years. I understand that the case. I had these counselor notification cases. Oh, it's been years now. Finally, the State Department got after the law enforcement officials and everyone else, and finally they decided they were going to comply. Isn't that about what happened? Years for the word to come down. And I think that the officers in this case did comply. They did take reasonable steps to comply with the JDA. They contacted the aunt. They immediately, almost immediately, within an hour or so, they were contacting the aunt. They were talking to the juvenile, getting contact information. And they took steps to comply with the JDA. And another thing about this case is that this juvenile is not someone that is not experienced. He had a border crossing card. There's evidence that he had come across into the United States before. He was driving a vehicle. Judge Huff commented that he looked much older than the 15 years that he was. It was not the situation where the officers were threatening him or getting him to break down in tears to make this statement. Here was an experienced young man, educated, who knew exactly what he was doing. So it wasn't the same sort of situation that you have in some of the other cases where there were violations and where the statement was used and where the officers did intimidate the witness. The officers were excused because this kid looked older than 15 and he was educated? I don't think that they're necessarily excused, but I think that if you look at the totality of the circumstances in this case, this case does not rise to a level of a situation that the conviction should be reversed or the information dismissed. There's no doubt that the officers did not follow to the letter each of the requirements of the JDA. They did on some levels, others that they fell a little short, and that's with not advising the aunt of the Miranda Rice. And perhaps, as the judge stated, not waiting an hour and a half to see whether or not someone would come to the port of entry. But you've got to understand that this is the business port in America, the San Ysidro Port of Entry. They have a situation where the officers have discovered this large amount of cocaine. They recognize the fact that because this individual is a juvenile, that they need to move expeditiously. So that's what they were trying to do. On the one hand, they need to move expeditiously. On the other hand, counsel is arguing that they should wait. So I'm sure that in some of these other cases, if they had waited for them. Why did they have to move expeditiously? In this particular case, you had a driver sole occupant of a vehicle bringing in this amount of cocaine. The officers, in their experience, felt that there had to be someone else involved in this. Perhaps if they got on the case quickly, that they may be able to find out where this cocaine was going to be delivered to. And that was one of the reasons that they wanted to move a little bit faster on this particular case. You want to use this boy as bait? Is that it? Well, not necessarily bait, but they wanted to investigate the case, maybe talk to him to see if he could provide some information to them as to where this cocaine was going to go, and perhaps make some arrests and get at the individuals who were behind the smuggling venture. Didn't we have testimony that I think one of them had four juveniles he'd arrested, and the other had, what, a dozen of them, and they always do it this way? Well, I don't think there was any testimony that they said they always do it this way. I think the testimony was that they had been involved in that number of cases. One had four prior juvenile cases, and another one had 10 to 15 juvenile cases. What did they say about how they handled it? I think that there may have been some testimony. Actually, it was the testimony of Agent Martinez with respect to the Miranda warnings, that he followed standard procedure. I don't believe that it was that they gave any details as to how they did those other cases, those prior cases. Let me ask you this. If they didn't have the statement from the juvenile, which indicated that he knew there was something wrong in there, and that's all they had was the juvenile in the car, and there was no indication that the juvenile knew anything about it, would there have been any information filed then? I believe so. As you may be aware, we have these cases all the time where you have a driver, sole occupant, who's driving a vehicle that's not registered to him, that has a sizable amount of cocaine. Their demeanor evidence indicates that they had knowledge that the drugs were in the car, and that's exactly what the officers had in this particular case. And, in fact, since Judge Huff suppressed the statement, we didn't use the statement. We know that you didn't use the statement. But the officers had the statement, and that was the basis for proceeding. Otherwise, they might have just tried to get the information of who his contacts were without arresting him and making him a juvenile delinquent. Well, I think in this particular case, because of the size of the load that was being smuggled into the United States, the type of drug that was being smuggled. Well, that's maybe. We don't have a record of it. That's maybe why the issue of whether or not he really was prejudiced ought to go back. Well, I think the court, in talking about the sufficiency of the evidence and in looking at this case, is whether or not there was any due process violation or any prejudice. I'm not looking at due process. Or prejudice. I'm looking at prejudice. I think Judge Huff explained that in her decision. And she did it during the proceeding, the juvenile delinquency proceeding. She also did it in response to the defense motion for judgment of acquittal, that when you look at the totality of the circumstances, the defendant's age, I mean the juvenile's age, the type and quantity of drugs involved in the case, his demeanor when he was at the border, the fact that he was the driver and the sole occupant of the vehicle. When they asked him who the vehicle belonged to, he first said it was his. Then he quickly changed it and said it was his uncle. And they said, well, who was your uncle? He didn't know the uncle's name. He had to look at the registration to pull out that name. So I think the court looked at all of that and said that even if there was no statement, there was enough evidence for the government to proceed with a juvenile delinquency proceeding. And that's what we did in this particular case. Unless there are any other. Let me ask you this. When I talked to the aunt, she said she could get to the border in an hour and a half. And then it wasn't the response that they couldn't wait. I don't know if the response was that they couldn't wait. That, too, was not developed. I think what was said was that they never asked her to come to the border. They asked her if she could come. She said that she lived far away. She could get there in an hour and a half, and then she was told, well, we can't wait. No, I don't think she was ever told that they can't wait. They were told to, she was told to continue to try to get a hold of the parents. If you could, there was never any discussion as to whether or not she should come or whether or not they wanted her to come. The aunt gave them permission to interrogate the boy, right? Correct. They didn't tell the aunt that Miranda was there. No, they did not. And did they tell the father of Miranda when he arrived, an hour after the phone call? When the father arrived, they advised the father as to why the juvenile was in custody. Did they tell the father about Miranda? I don't believe so. At that time, they had already interrogated the juvenile. But they didn't tell the father about Miranda, huh? No. And again- How are these guys going to learn to do it right? They will learn because we will- They'll learn because we keep saying it's harmless. So they learn that they don't have to do it. Well, I think that they're learning and that there needs to be training. Well, you know, Miranda is 40 years old. 41 years old. Isn't that right? That's correct. What year is this? This is 06. 41 years. Well, I think if you've got to- Long time for the word to get down, huh? Well, I think you have to put it into the context of why these rules are there. And they're to protect juveniles, particularly folks who are not citizens of the United States, from being in a strange land, in a strange place, being intimidated by law enforcement officers. And if you look at the background, the experience of this particular juvenile, that's not the case. It's not a case where he didn't have experience. He wasn't-he was educated, as I said before. He'd been in the United States before. He had a border crossing card. He told the officers he was coming over here to go shopping. So that appears that he's had some experience in the United States. So he's not the type of juvenile that these rules were set up for. You don't believe that, do you? Somewhat, yes, sir, I do. Unless there's anything else, we submit that the case should not be reversed and that the information should not be dismissed. Thank you. Very briefly, Your Honors. Just a couple points. I think that Your Honors are correct and the Court is correct that I don't think it matters what the juvenile looks like. There was no question that this juvenile was 15 years old. The primary officer knew that. The Agent Cabrera, who made the 3-minute phone call to her aunt, Agent Zucchelli, who interrogated him, Agent Martinez, who was the interpreter, they all knew he was 15 years old. There was no question as to that. There's, in the record, indicates that he had no prior law enforcement contacts, simply had a border crossing card, and prior to that had only crossed with his grandfather. I believe that's what the record indicates. With respect to whether there was any testimony of how many, whether the agents do this all the time, I think Mr. Jones specifically asked Agent Cabrera a question. And the procedure that you followed in this particular case, is it similar to the procedure that you followed in those cases, and that's referring to the 10, 15 cases? Yes. How many other cases involving juveniles would you say you've been involved in? Roughly 10 to 15 cases. This is not just this one case because this juvenile looked a little older or because it was cocaine and they were afraid that the cocaine might evaporate and they needed to move expeditiously. This is something that is, I would say, an epidemic in the Southern District of California at least. Who knows what's going on in other districts? And I think that there is a due process violation. Wendy G. tells us that even just looking to the parental notification rights, it's to allow meaningful consult with either a parent or guardian. And that was not done here. Even when his father, excuse me, arrived at 7 o'clock, they didn't even advise him then to tell him, this is what happened, these are his rights, you can speak to him if you like. He was given about five minutes to speak to his son before he was transported to juvenile hall. And I'd move into that. They were trying to move expeditiously and interrogating the juvenile right away, but then he wasn't taken to juvenile hall until 9.30 p.m., and then the information wasn't filed until 12 p.m., and then he wasn't arraigned until 3.30 in the afternoon, another violation of the JDA. I think there's numerous violations here. There are due process violations, and I think the information, I believe the information should be dismissed. All right. Thank you, Mr. Jones. You know, what I don't understand is this. Federal defenders, you know, in San Diego? Yes. They're tigers, right? Yes, they are. They're watching every move, right? Every move. And that's what they're there for. They're there to keep the system honest, right? Yes. Yeah. Make sure that the rules are followed. So knowing you've got these ferocious watchdogs, why doesn't someone get the, you know, figure out that we've got to do this right? Well, Your Honor, I think that the agents are doing the best that they can because you've got to understand at the border, at the business port in the world, things are happening a mile a minute. They sometimes don't have the time to sit down and do everything in order, but they get the job done. And that's what they did in this particular case. You had three different agents who were talking to this juvenile because they work as a team. It's a metaphysical sort of environment down there, if you will. They're all working together at that port whenever they have a situation that involves this type of crime. What does this have to do with it? Well, I think that, you know, the counsel talks about the fact that, you know, Agent Cabrera spoke to him. Agent Zucchelli spoke to him. Agent Martinez spoke to him. As if to say that there was one agent who came in immediately and had a checklist and said that we're going to do all these things. And they couldn't. They had one agent interviewing. They had another agent talking to the primary officers to see what kind of drugs they had, assessing the situation. They had another agent preparing to do the Miranda rights. You had another agent who was contacting the parents because they know what the rules are. And they're doing that. And in this particular case, they took reasonable steps to comply with the JDA. Yes, there may have been some missteps. Yes, they may not have done everything technically on point and in the time that they should have. But when you look at the totality of the circumstances, there's no due process violation or prejudice. But, yeah, but, you know, when you go down and say there's no prejudice, we know. I mean, you can look at the statistics around here. Ninety-nine percent of the people that get indicted are convicted, right? So why don't we just throw all the rules away and say there's no prejudice and just forget about it? No, I think the prejudice here is that. It's part of our system. It's part of our system, that's all. I mean, you know, we get, we got dumped on us, oh, from the Justice Department, 8,000 extra immigration cases, you know, the past two years. Because somebody up there is not doing their job. So what are we supposed to do? Say, well, we got all this and, you know, we're just going to go through these, give them two minutes apiece, and we're rushed for time. It's not the way the system's supposed to work. I agree, Your Honor. We don't do that. I don't think they, I think the agents shouldn't do it either.  I'm just saying that in this particular case and in other cases where they perhaps don't follow it to the T, that you do have to do the analysis that this Court has set up. And that's whether or not there's a due process violation or whether or not there's prejudice. And I think in this case, neither one of those were present. You know how I feel about it. Yes. Okay. Thank you, Your Honor. Okay. I appreciate the argument on both sides. Very good. We'll come to the United States versus.
judges: Bright , Pregerson, Alarcon.